# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| **WILLIAM A. MUNCK,** | § | |
| **SUZANNE T. MUNCK, AND** | § | |
| **WILLIAM P.J. MUNCK,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:14-cv-173** |
| | § | |
| **DALLAS LACROSSE ACADEMY, LLC** | § | |
| **d/b/a COAST2COAST LACROSSE,** | § | |
| **d/b/a C2C LACROSSE, and d/b/a** | § | |
| **MAVERIK LACROSSE ACADEMY,** | § | |
| **JOHN A. MARANO, KEVIN** | § | |
| **BARNICLE, ALEXANDER POOLE,** | § | |
| **CHRISTOPHER VAN DORN,** | § | |
| **ROBERT SEEBOLD, AND** | § | |
| **STEVEN KRAVIT,** | § | |
| | § | |
| **Defendants.** | § | |

## ORIGINAL COMPLAINT

Plaintiffs William A. Munck, Suzanne T. Munck, and William P.J. Munck  (collectively, "Plaintiffs") file the following Original Complaint against Defendants Dallas Lacrosse Academy, LLC d/b/a Coast2Coast Lacrosse, d/b/a C2C Lacrosse, and d/b/a Maverik Lacrosse Academy ("DLA"), John A. Marano ("Marano"), Kevin Barnicle ("Barnicle"), Alexander Poole ("Poole"), Christopher Van Dorn ("Van Dorn"), Robert Seebold ("Seebold"), and Steven Kravit ("Kravit") (collectively, the "RICO Defendants").

# I.
# INTRODUCTION

Texas is no stranger to scandals involving sports teams.  When lacrosse grew in popularity in Texas, it is not surprising that corrupt individuals looked for ways to profit from this sport that was new to Texas.  The RICO Defendants in this case are those corrupt individuals.

DLA holds itself out as an elite lacrosse organization whose mission is "to develop student-athletes possessing both character and integrity.  They will serve as positive members of the school community and the greater society."  The true mission for DLA has nothing to do with character or integrity.  DLA and the RICO Defendants pushed their student athletes to participate in DLA if they wanted to play or succeed in their youth and high school programs.

Through the use of illegal and fraudulent conduct, including threats, intimidation, and even extortion, Defendants have tried to ensure that student athletes who want to play lacrosse in North Texas have to pay-for-play and have to go through Defendants' enterprise.  Those who do not acquiesce to the RICO Defendants' threats and demands suffer.  Billy Munck was one of the victims of this criminal enterprise as were many others.  Plaintiffs file this complaint to ensure that others, including Billy's younger brother — a high school sophomore, do not suffer a similar fate.

# II.
# PARTIES

1.      Plaintiffs William A. Munck, Suzanne T. Munck, and William P.J. Munck are individuals who permanently reside in McKinney, Collin County, Texas.

2.      Defendant Dallas Lacrosse Academy, LLC d/b/a Coast2Coast Lacrosse, d/b/a C2C Lacrosse, and d/b/a Maverik Lacrosse Academy is a Texas limited liability company and

may be served with process by and through its registered agent, John A. Marano, at 2228 Lady Cornwall Drive, Lewisville, Texas 75056.

3. Defendant John A. Marano is an individual residing in Lewisville, Denton County, Texas, and may be served with process at his residence at 2228 Lady Cornwall Drive, Lewisville, Texas 75056.

4. Defendant Kevin Barnicle is an individual residing in Dallas, Dallas County, Texas, and may be served with process at his residence at 4808 Willow Lane, Dallas, Texas 75244.

5. Defendant Alexander Poole is an individual residing in Lewisville, Denton County, Texas, and may be served with process at his residence at 1105 Damsel Caroline Drive, Lewisville, Texas 75056.

6. Defendant Christopher Van Dorn is an individual residing in Dallas, Dallas County, Texas, and may be served with process at his residence at 4336 Druid Lane, Dallas, Texas 75205.

7. Defendant Robert Seebold is an individual residing in Dallas, Dallas County, Texas, and may be served with process at his residence at 4308 Stanford Avenue, Dallas, Texas 75225.

8. Defendant Steven Kravit is an individual residing in Plano, Collin County, Texas, and may be served with process as his residence at 5833 Brookhaven Drive, Plano, Texas 75093.

### III.
### JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under 18 U.S.C. § 1961 *et seq.* as set forth below.

10.     This Court has personal jurisdiction over the RICO Defendants because all are residents of Texas and the RICO Defendants' conduct that forms the basis of this lawsuit and the resulting harm occurred in Texas.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because (1) the RICO Defendants are all residents of Texas, and C2C, Marano, Poole, and Kravit reside in this district; and (2) a substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred in this district.  Venue is also proper in this district pursuant to 18 U.S.C. § 1965.

**IV.**
**FACTUAL BACKGROUND**

**Robert Seebold**

12.     Robert Seebold is an often-between-jobs Information Technology ("IT") executive who played college lacrosse in the early 1980s.  Seebold has been a volunteer lacrosse coach in the Highland Park Youth Lacrosse program for the past several years.  The Highland Park lacrosse program is one of the premier lacrosse programs across the southern United States and has been a perennial Texas High School Lacrosse power and frequent state champion.

13.     For years, Seebold attempted to build a career around the sport of lacrosse.  He tried first to develop an ownership group to lure a professional indoor lacrosse team to Dallas; next he devised his business plan for his for-profit year-round lacrosse venture; and, most recently, he partnered in a lacrosse-themed clothing distributorship.  Seebold's success has been limited to his for-profit year-round lacrosse venture, and he has been willing to go to great lengths to ensure that "success."

14.     In 2006, Seebold was a founding partner in RiverRock Partners, LLC, a privately held firm specializing in the acquisition and management of technology businesses.  RiverRock's offices were located at 15851 Dallas Parkway, Suite 600, Addison, Texas 75001.  By the

summer 2008, Seebold was disengaging from RiverRock and increasingly concentrated his time working on his new brainchild – a "for-profit" year-round lacrosse venture.

15.     By late summer 2008, Seebold was no longer partnering with RiverRock and was only providing limited consulting services to the partnership.  Seebold was now "all in" for his year-round for-profit lacrosse venture.  To that purpose, he maintained his office at RiverRock's 15851 Dallas Parkway headquarters, using it as his staging place to develop and execute his business plan.  Through these offices, Seebold donned himself the ranking member of what became a quasi-criminal enterprise.  Seebold has worked vigilantly to keep his leadership role, interest, and compensation secret while he managed his for-profit year-round lacrosse venture.

## The Growth of Lacrosse and the North Texas Community

16.     Lacrosse has become a very popular team sport across North America.  Through the 1990s, lacrosse in the United States was a regional sport centered about the northeastern United States.  As the game grew, it moved to the south, including Texas.

17.     Collegiate lacrosse represents the highest amateur level of the game in the United States and is played through the National Collegiate Athletic Association ("NCAA") at each of the Division I, II and III levels.   The NCAA has sponsored the men's national lacrosse championship tournament for the past 43 years.   In 1998, a number of national lacrosse organizations across the United States merged and established US Lacrosse, Inc. ("USL"), a unified national governing body for men and women's lacrosse.

18.     In 2007, US Lacrosse reported a record 2,612 boys' high school lacrosse programs across the country, which is more than double the number of programs existing in 2000 for an average annual growth of 190 new programs per year for seven consecutive years.  From 2012 to 2013, the NCAA reported that lacrosse grew faster at the college level than any other

sport – lacrosse was the sport with the highest number of new men's teams added (26) and women's teams added (40).  The NCAA further reported that there were 416 NCAA-sanctioned women's lacrosse teams with 9,521 college athletes, and 319 NCAA-sanctioned men's lacrosse teams with 11,722 college athletes.

19.     By 2002, there were nearly 2,000 youth lacrosse players in North Texas, and, at the high school level, Highland Park began establishing itself as a national power, dominating high school teams throughout Texas and competing with nationally recognized programs from around the country.  Two pivotal events occurred around this time:  (1) the Highland Park lacrosse program began a community-based summer travel lacrosse program; and (2) a group of lacrosse enthusiasts approached USL about starting a local USL chapter in North Texas.  The Highland Park lacrosse program was named "LoneStar."

20.     Highland Park's purpose for starting LoneStar lacrosse was to further develop youth players from University Park and Highland Park and provide those players an opportunity to enjoy a community-based summer youth lacrosse program. The Highland Park LoneStar lacrosse program's purpose was to build quality youth teams that would compete successfully at regional and national tournaments.  The Highland Park leadership brought nationally renowned lacrosse camps and clinics to Highland Park to ensure that the younger players were developing correct habits and techniques.  One such camp brought former-Syracuse greats Casey Powell, Ryan Powell, and John Zulberti, among others, to Highlander Stadium for a day camp.

21.     USL, as the national governing body for lacrosse, offered the North Texas community the opportunity to participate in and embrace lacrosse through the programs and services USL provided to its chapters to increase participation in lacrosse while protecting the integrity of the sport.  In 2004, US Lacrosse of North Texas, Inc. ("USLNT"), a 501(c)(3)

corporation, was formed as the North Texas extension of USL.  USLNT became the educational, hierarchical and support system for its membership and teams.  USLNT initially administered the spring youth lacrosse league that became known as the North Texas Youth Lacrosse Association ("NTYLA").  A couple of years later, NTYLA became the year-round governing body for youth lacrosse in North Texas.  USLNT and NTYLA were volunteer organizations that operated on monies derived from fees received for administering tournaments and youth leagues, donations, and revenue sharing with USL.  As a precondition of "chapterhood," USL required USLNT to require every player of every NTYLA team to be a member of USL and to pay $25 per year to USL which, in return, USL agreed to return $2 per player membership fee to USLNT to be used for USLNT operations.

22.     At about this same time, the leadership of the Highland Park Lacrosse program realized that their program was at a crossroads.  On the one hand, Highland Park's youth through high school programs were dominating their opponents throughout Texas, but on the other hand, because statewide talent was generally poor at all levels, Highland Park's travel teams were having difficulty beating equally matched travel programs from the Northeast.  While the Highland Park travel teams were just as talented as their Northeastern peers, the Highland Park players were not used to seeing similar competition levels.  Highland Park's leadership decided that the quality of lacrosse across North Texas must improve.  Highland Park's leadership decided to bring its summer LoneStar lacrosse program to USLNT, asking USLNT to "take ownership" and administer the same and to open the program up to all teams and all players across North Texas.

23.     The USLNT "LoneStar[®]" lacrosse program was organized solely to grow the lacrosse community across the Metroplex through select youth travel teams comprised of elite

local lacrosse players.  The LoneStar program's goal was to encourage its players to achieve their "best," not just on the field, but off the field as well, and further enhance what became the proud tradition of North Texas lacrosse.  The USLNT LoneStar 2004 program comprised two boys' summer travel teams (U13 and U15), totaling 42 boys.  Each player's family was charged a $1,250 fee for a program total of $52,500.  The 2004 fee covered the player's round-trip airfare, hotel, meals, and ground transportation while at the tournament, along with 8-10 practice hours per week for six weeks preceding the tournament trip.  In 2004, all coaches and administrators were unpaid volunteers, and the program was able to raise enough money through donations to break even.

24.     By 2007, the USLNT LoneStar program grew to two boys' winter travel teams (U13 and U15), and six boys' summer travel teams (one U11, two U13, and three U15) and two girls' summer travel teams (U13 and U15).  Each of the 10 teams averaged 22 players for a total of approximately 220 players, and each player's family was charged approximately $1,350 for a program total of $300,000.  The 2007 fee covered the same player amenities set forth above.  By 2007, all administrators remained unpaid volunteers, however the program grew and became so popular that USLNT was required to pay stipends to secure additional coaches.

25.     During the summer of 2008, a "rising sophomore" high school team was added for the first time.  Thirty veteran LoneStar players were invited to participate on this team and 27 accepted.  The team traveled to North Carolina to a college recruiting tournament and competed against predominately select "rising senior" teams from across the East Coast.  The purpose of this team was to give these players and their families an opportunity to experience and begin to understand the college recruiting process.  The overwhelming participation of the veteran

LoneStar players and their collective success against older competition suggested that a marketplace existed for a year-round for-profit lacrosse program.

26.     USLNT reviewed and endorsed summer lacrosse camps that improved player skill through proven drills, demonstrations and games.  The USLNT standard quickly became the Powell Brothers lacrosse camps that provided position specific training and demonstrations that increased player understanding of the intricacies of each position and overall team play.  The Powell brothers, Casey and Ryan initially, and then Mikey, began running half-day, then full-day, and then multi-day lacrosse camps in Dallas.  Each brother was a four-time All-American and NCAA Division I Champion with Syracuse University.  Together they operated lacrosse camps around the country.  In North Texas, the Powell Brothers' following grew from several dozen players attending a half-day clinic offered for free by USLNT to a couple of hundred players attending a four-day camp.  Players' families paid less than $400 to attend these day camps.  By summer 2008, along with the Powell Brothers' camps, there were several local and regional lacrosse "skills" camps also operating in North Texas.

27.     By 2013, the Texas High School Lacrosse League ("THSLL," the membership association for boys' high school lacrosse) comprised more than 90 member high school programs, and became home to 160 varsity and junior varsity teams comprising more than 3,700 high school student athletes across the State of Texas.  Like the founding tenets of USLNT, THSLL endeavors to provide an environment for positive experiences and motivation for success on the field and off by building self-esteem and confidence and teaching teamwork and discipline.  In 2013, and in North Texas alone, USLNT counted its youth lacrosse membership at more than 6,000 strong.  USLNT, through NTYLL (successor to NTYLA), still required all

youth members to be paying members of USL, which received more than $150,000 from North Texas families in 2013 alone.

**The For-Profit Year-Round Lacrosse Venture**

28.    During 2008, Seebold spent time at his RiverRock office investigating how a year-round select lacrosse program could be profitable.  Seebold's program, like select soccer programs before it, would offer year-round clinics and travel teams, periodic camps, and merchandise.  If 300 players enrolled at an average of $3,000, a venture would raise nearly $1,000,000, and if 500 players enrolled at an average of $5,000, a venture would raise $2,500,000.

29.    To understand the potential client base, Seebold analyzed the origin, administration and growth of the USLNT LoneStar program.  Seebold had communications with some of those responsible for administering, coaching and growing the LoneStar program for USLNT.  Under the pretext of being interested in becoming involved with USLNT and the LoneStar program, Seebold concentrated his data gathering on the per player participation cost, the per player amenities provided by USLNT, and the LoneStar program's consistent financial losses.  During one such meeting, Seebold expressed frustration that USLNT was giving away too much to the players and was not run as a profit driven program for the entity.  Seebold's frustration extended to the fact that the LoneStar program remained largely volunteer driven – completely volunteer at the administrative level and partially volunteer at the coaching level.

30.    From his evaluation of the composition of the LoneStar program, Seebold began looking at the North Texas lacrosse community two dimensionally.  On the one hand, the North Texas lacrosse community was divided into three geographic zones and, on the other hand, Seebold divided the community across public school and private school lines.  The zones were

"Southeastern" (south of 635 and east of 35E), "Northeastern" (north of 635 and east of 35E), and "Western" (west of 35E).  Seebold identified the Highland Park (Southeastern) and Plano Junior/Wrangler and surrounding areas (Northeastern) youth lacrosse programs as critical.  The Western zone included the Coppell and Southlake programs.

31.     By 2008, the Highland Park Lacrosse program had nearly 600 players across three high school teams, eight youth (5th-8th grade) teams, and its Bantam (1st-4th grade) program; the three high school teams comprised less than 100 players, meaning that the youth program included approximately 500 players.  Also in 2008, the Plano Junior/Wrangler lacrosse programs had nearly 400 players across six high school teams and their youth and Bantam programs; the six high school teams comprised approximately 115 players, meaning that the youth programs included slightly less than 300 players.

32.     The Highland Park youth lacrosse program was most critical because many of their players fed not only the Highland Park High School program, but also the middle and high school programs at St. Mark's, the Episcopal School of Dallas ("ESD"), Jesuit College Preparatory School, and Hillcrest High School.

33.     Seebold held a leadership position within the Highland Park youth lacrosse program.  The Highland Park lacrosse program however had a strict youth coaches' conflict of interest policy.  In 2006, Highland Park had requested that a very popular and successful volunteer youth coach step down because he was the father of two players; the Highland Park program made the request to avoid even an appearance of player favoritism.  Seebold's plan of a year-round for-profit lacrosse program was in direct conflict with his responsibilities to the Highland Park lacrosse program.

34.     Seebold decided his year-round select lacrosse program must be owned and operated through a corporate entity, and that the shareholders and officers of that corporation would be in a "partnership" with him. This corporate layer and behind-the-scenes partnership would enable Seebold to mask his leadership role, interest, and compensation in the for-profit program from the Highland Park lacrosse program. The decision to create a separate contractual partnership behind the corporate entity was the inception of what would become his enterprise. Seebold would manage the partnership to ensure the corporation's profitability, and would be able to remain behind-the-scenes.

**Identifying the Competition and Creating the "Front Man"**

35.     As Seebold believed he could coordinate and control the Highland Park lacrosse program, he required a partner that could coordinate and control the Northeastern zone which included Texas high school programs such as Plano Senior High School and Plano West High School. During 2008, the Plano West High School program was changing coaching staffs, and Plano Senior's head coach was a veteran USLNT LoneStar lacrosse coach. With no cohesion among the high school programs, Seebold focused on the Northeastern zone youth programs, identifying and connecting with John A. Marano.

36.     Marano was an active Bantam (U11) lacrosse coach in the West Plano/Carrolton area. Marano was the father of a Bantam player through the Highland Park lacrosse program and had worked in recent years with a group of parents to bring lacrosse to Castle Hills. The youth program in Castle Hills grew and today is known as the Hebron Lacrosse Association. Marano himself is an often-between-jobs IT salesman.

37.     In 2008, Marano was relatively unknown to the North Texas youth lacrosse community with the exception of the lacrosse parents in West Plano and Castle Hills. Within

those communities, Marano was able to create a persona of a "former Long Island" lacrosse player from New York – a father and coach with meaningful East Coast lacrosse experience. This persona gained Marano traction among the Castle Hills and West Plano lacrosse parents who were new to the sport and had no reason to know that they were being lied to. Seebold knew Marano from his Dallas men's club lacrosse league days and liked what he now saw in Marano. Seebold began recruiting Marano to his enterprise.

38.     By late summer 2008, Seebold sold Marano on his year-round lacrosse venture, and Marano agreed to a behind-the-scene partnership with Seebold to mask Seebold's actual role, interest, and compensation in the for-profit program. Marano agreed to be the majority shareholder and president of the corporate entity. Marano started working regularly with Seebold and made routine use of RiverRock's corporate offices. Together, Seebold and Marano reworked Marano's persona as the "front man" for the corporate entity. Marano began holding himself out as having "a lifetime" of lacrosse experiences, first as a youth and middle school lacrosse player growing up on Long Island, then as a high school "all-star" that went on to play for his high school coach at St. Johns University in Queens, New York. Marano would use this persona to lure unsuspecting parents into their for-profit program with assurances that their children would have at least the same high school and college experiences that Marano had. As time passed, Marano could not help but embellish his image and went so far as claim to be a high school All-American, and then a college All-American. Marano is also known to insinuate that he was "connected" back in his days in New York.

39.     Seebold and Marano began working to create a geographically-based list of high school and youth coaches cross-referenced against the estimated player totals each coach "controlled." Seebold and Marano then ranked the coaches by their players' family's ability to

pay.  This list included both public and private school lacrosse clubs.  The top of the list included the high school coaching staffs at Highland Park, St. Mark's, ESD, Plano West, Jesuit, Greenhill, and Coppell, along with the youth coaches/program directors at Plano Sports Authority, Plano Wrangler, Southlake, and the Dallas Deuces.

40.     Seebold also created a list of lacrosse equipment manufacturers ranked initially by market share and later on by the "likelihood" each manufacturer would support the for-profit venture.  The four traditional lacrosse equipment manufacturers were Warrior, Cascade Sports, Brine, and STX.  There were two mega-brands, Nike and Under Armour, that were new to the sport of lacrosse, and traditional hockey equipment manufacturer Easton was exploring the profitability of a broad range of lacrosse products.  Seebold would come to believe that each of the foregoing equipment manufacturers would have little interest in teaming with a for-profit lacrosse venture.

41.     Finally, Seebold and Marano created a list of potential competitors.  With respect to travel teams, Seebold and Marano focused on the StickStar/DallasSelect high school program, the Team Dallas high school program, USLNT's LoneStar youth program, the Team North Texas youth travel program, and the Bratva Lacrosse Club.  With respect to lacrosse camps, Seebold and Marano focused on the Powell Brothers camps, the Dallas Deuces camp, and the Big "D" Lacrosse camp.

**The Northeastern Geographic Zone – Recruiting Steven Kravit**

42.     Steven Kravit injected himself into the West Plano lacrosse community in 2006 as a Bantam lacrosse parent looking to volunteer and help out in any way that he could.  At first, Kravit held himself out as a Massachusetts native with some familiarity with lacrosse, and he regularly offered his "organizational skills" gleaned from his business experience.   Kravit

quickly realized that North Texas families were incredibly trusting and were desperate for former northeastern lacrosse players to coach their children.  When Marano appeared, he and Kravit quickly developed a friendship.  Kravit watched as Marano spun his tales of greatness and was only encouraged by Marano's successes.  Kravit began telling parents that he grew up playing lacrosse in the Boston area. Kravit would tell the lacrosse community that while he did not play in college, he was voted "team captain" back in Massachusetts (1974) and that he was also his lacrosse team's "leading scorer" his final two years (1973 and 1974).  What Kravit chose not to tell his audience was that he was in middle school during those years, and he never achieved accolades regarding lacrosse in high school nor did he have any opportunity to play in college.

43.     By summer of 2008, Kravit volunteered his way into being the director of the Plano Junior Lacrosse program, which was organized and administered through the Plano Sports Authority, Inc. ("PSA").  As the director of the PSA Plano Junior Lacrosse program, Kravit had an advisory board position to PSA's executive director, and was also charged with administering the annual Plano Junior Jam fall lacrosse festival.  Kravit was also a volunteer junior varsity lacrosse coach with the Plano West Lacrosse Club, Inc. ("PWLC") and an advisor to the high school program's directors.  PSA and the PWLC were (and remain) non-profit or 501(c)(3) entities.  Kravit has held various officer positions with PWLC in recent years, including the position of President.

44.     PSA and PWLC are independent entities and fall under the State of Texas' rules for non-profits.  The Board of Directors for each entity consists entirely of volunteers and no Board member draws a salary.  Both entities were incorporated independent of the City of Plano, though both secure field space through the City.  PSA sports league coaches are volunteers, though some PSA "skills and clinic" coaches receive pay for their coaching services.  Most

PWLC coaches are parent volunteers, though some disinterested coaches receive pay for their expertise, such as some high school coaches.  All the monies collected by PSA and PWLC must be accounted for annually with primary costs including payments to officials/referees and professional coaches, program equipment, facility rentals/mortgages, and a limited number of need-based scholarships.  Any monies remaining for either entity at year-end are considered for investment projects the following year; as 501(c)(3) entities, there is no stock or ownership by any individuals in PSA or PWLC, so remaining monies cannot be distributed to individual owners as profits or dividends.

45.     Like Seebold's relationship with the Highland Park Lacrosse Program, Kravit's relationships with PSA's Plano Junior Lacrosse program and his growing role with PWLC posed a potential conflict of interest.  As Kravit did not possess either a lacrosse pedigree or coaching experience, any remuneration Kravit received from Seebold's for-profit lacrosse venture would be strictly as a function of Kravit's ability to drive paying players and their families from PSA's Plano Junior Lacrosse Program or the PWLC to Seebold and Marano.  Any such payment to Kravit would be in direct conflict with the founding tenets of both PSA and PWLC.  Upon information and belief, Seebold and Kravit agreed that Kravit could not be an owner in the year-round for-profit venture, but like Seebold, he could have an arrangement with the corporate entity that he could derive compensation while at the same time conceal his financial relationship from PSA and PWLC.  Kravit's compensation would be based in part upon the number of paying players he "originated" for the venture from PSA's Plano Junior Lacrosse program.

**Recruiting a Prominent High School Coach to the For-Profit Entity**

46.     To attract recruiting-age high school lacrosse players (i.e., rising eighth graders through rising seniors) to his year-round venture, Seebold had to have a credible high school

**ORIGINAL COMPLAINT**                                                                                   **PAGE 16**

coach that would be his face of the college recruiting process.  North Texas was traditionally a recruiting hotbed for college football, baseball and basketball.

47.     In 2008, there were nearly 60 NCAA Division I, 50 NCAA Division II, and 200 NCAA Division III lacrosse programs, and almost 160,000 high school boys lacrosse players. The NCAA mandated maximum number of lacrosse scholarships per program (*i.e.*, over four years) was and remains 12.6 for NCAA Division I, 10.6 for NCAA Division II, and none for NCAA Division III.  The average number of lacrosse scholarships per fully-funded NCAA Division I program is 3.15 per year with an average of 12 players per recruiting class.  In 2008, there were less than 30 fully-funded NCAA Division I lacrosse programs.

48.     During the summer of 2008, the Bratva Lacrosse Club started its North Texas operations as a for-profit program intending to operate primarily during the fall and summer months (or not during the traditional spring lacrosse season).  Bratva was founded by Peter Tumbas, the then-head junior varsity coach for the Highland Park Lacrosse Club, and championed by Christopher Van Dorn, the then-assistant varsity coach for Highland Park. Tumbas was to coach the rising freshman, and Van Dorn was to coach the rising juniors and seniors in recruiting tournament play beginning in the fall of 2008.  Bratva's pitch, primarily made to the Highland Park and local private high school parents, was that the only thing holding back the North Texas recruiting-age high school lacrosse players from playing top Division I lacrosse was their lacrosse IQ and game sense.  Bratva offered a purportedly specialized program including "written theory, film review, high tempo college level drills, Bratva [Lacrosse Club] players will learn skills necessary to become impact players this spring [2009]."

49.     North Texas families lined up and signed up with Bratva.  Bratva quickly started collecting and cashing checks. Bratva failed to deliver and the lacrosse program never

materialized.  When it was obvious that Tumbas would fail, the Highland Park Lacrosse Club terminated their relationship with him, and Tumbas quickly left the area.

50.     The Bratva debacle provided Seebold and Marano a reason to meet with select North Texas high school coaches to gauge their interest in collaborating in a year-round venture, their availability to work as a paid coach for the venture, or to identify the venture's competition. Seebold and Marano confirmed through these meetings the assumptions Seebold made at his RiverRock's offices.  Most of the coaches were interested in learning more about paid coaching positions, but few brought the lacrosse pedigree and reputation that Seebold wanted for his face of college recruiting, and those with a suitable pedigree were closely aligned with USLNT and its LoneStar travel program.

51.     In meetings with North Texas coaches, Seebold pitched that there were too many outsiders coming into North Texas organizing select teams or bringing skills camps, some of whom he argued were not qualified to coach local players.  Marano pitched that the local coaches developed North Texas lacrosse and, as a group, they were more than capable of delivering qualified coaching and camps to the North Texas families.  They pitched that the local coaches should work together to provide the services (*e.g.*, hire one another to work each other's camps, etc.), cooperate on pricing so as to not undercut one another, and agree to not support any "outsider" coming into North Texas.  In short, the North Texas players belong to the North Texas lacrosse programs and the North Texas families' money belongs in the pockets of the North Texas lacrosse coaches.

52.     In early fall 2008 following these meetings, Seebold and Marano adopted a theme that the local coaches and programs were "either with them or against them."  These statements were subtle at first while Seebold searched for someone that could fill the role of a college

recruiting coordinator.  After failing to entice a couple of private high school coaches, Seebold identified Alex Poole.  Poole had recently been named the head coach for the men's club lacrosse team at Southern Methodist University.  Poole had previously been an assistant coach with ESD and the USLNT LoneStar program, was a co-owner of the Big "D" Lacrosse Camps, and was a multi-term member of the USLNT Board of Directors.  By coincidence, Poole had just completed a business plan for taking SMU's club lacrosse team from the MCLA ranks to NCAA Division 1, and was initially interested in improving lacrosse across North Texas.  However, once Seebold introduced Poole to his concept and the profitability of his year-round venture, upon information and belief, Poole agreed to (i) a minority ownership position in the corporate entity, (ii) assume the role of lead program coach and college recruiting coordinator, (iii) terminate his interest in Big "D" Lacrosse Camps, and (iv) mask Seebold's involvement and compensation from the Highland Park Lacrosse Club.

**Formation of the Dallas Lacrosse Academy, LLC**

53.    Seebold, Poole and Marano began meeting regularly, and undertook the steps necessary to form the Dallas Lacrosse Academy, LLC ("DLA").  Marano and Poole divided ownership of the stock 51% to 49%, respectively, and Marano became president.  Although actually in charge of the year-round venture, Seebold's name cannot be found anywhere in DLA's organizational records; nevertheless, Seebold continued to orchestrate the development of the enterprise and the schemes for compensating both himself and his cohorts.

54.    Poole was one of three equal owners in the Big "D" Lacrosse Camps along with Kevin Barnicle (the then-head lacrosse coach at ESD) and Van Dorn.  To pursue the DLA opportunity, Poole approached Barnicle and Van Dorn about terminating their business relationship.  Poole explained that Marano approached him with a business plan for a "year-

round" venture and the financial opportunity was too great to pass up.  Upon and information

and belief, Barnicle was furious because he had brought the idea of a "year-round" program to

Poole earlier and Poole had passed on the idea because of his Board position with USLNT and

his coaching relationship with USLNT's LoneStar program.  Both Barnicle and Van Dorn

wanted to know their roles in DLA going forward, and Poole told them that DLA would want to

hire both as paid coaches.  Poole also offered to relinquish his ownership in the Big "D"

Lacrosse Camp once the three of them divide the proceeds from their recently completed

summer camps.  After some pleading, Poole told Barnicle and Van Dorn that was final; there

was no ownership opportunity in DLA for either of them.

55.    During the fall of 2008, Marano and Poole began meeting with and offering

coaching positions to local coaches from the high school programs at Plano West, Highland

Park, St. Mark's, Greenhill, and Coppell, among others.  All along, Poole believed that Barnicle

and Van Dorn would eventually come around and accept positions as paid coaches.  Similarly,

they met with the youth coaches/program directors from Plano Wrangler, Southlake and several

of the private schools, Kravit was instrumental in this regard.  The coaching offers were for

coaching teams and clinics for DLA, and there were discussions with some coaches who were

perceived to control their respective program's families about additional compensation or

bonuses, based upon the number of players from their program that they could direct to DLA – a

player origination credit.

56.    Origination discussions became fairly detailed including discussions of shared

origination credit; whether origination credit should be determined seasonally, yearly, by age

bracket, or "for life"; and mechanisms for resolving conflicts concerning joint origination claims.

Seebold outlined these discussions and would participate in purported support of Marano and/or

Poole whenever he felt that either or both of his partners might be in over their heads with a particular coaching target.  Kravit participated similarly with respect to coaching targets in the Northeastern zone, and then elsewhere as needed.

57.     For instance, there were two prominent African-American coaches in North Texas, and both were thought to have developing credibility in the African-American community.  Kravit was charged with assisting Marano and Poole in recruiting them.  The offers discussed with both coaches would be at or around $10,000 plus credit for new players brought into the DLA program.  With respect to one coach, he would not be given origination credit (or sales commission) for the high school players within his program but would be given credit/commission for any players that he could recruit from a physical training business he owned that focused on lacrosse players.  He believed that he could not be given credit for high school players he coached because of the inherent conflict of interest.  He later understood that "credit" for his high school players was claimed before he was ever spoken to about joining the DLA coaching staff.

**Barnicle and Van Dorn Become "Contract Partners" in Maverik DLA**

58.     Barnicle and Van Dorn continued their discussions with Poole and Marano, rejecting the notion of being paid members of the DLA coaching staff.  Barnicle and Van Dorn ultimately threatened the success of the entire venture.  Not knowing of Seebold's involvement, they "promised" Poole that if he went forward with this venture with Marano, DLA should not count on seeing players from ESD, St. Mark's or Highland Park.  Barnicle and Van Dorn promised to use every means that they could to stop those players from signing up for the DLA program. Barnicle and Van Dorn continued to press Poole to rethink his decision, drop Marano, and work with them to make Big "D" the year-round program.

59.     To Marano's frustration, Seebold directed Marano and Poole to "do a deal" with Barnicle and Van Dorn.  Seebold confided in Marano that he did not trust Barnicle and did not want him, Van Dorn, and Poole having the ability to control the corporate entity.  Seebold wanted Barnicle and Van Dorn to agree to a lesser position to start, and if they proved themselves by delivering players and performing administrative tasks successfully, then they would be offered a larger piece of the venture in the future.  Seebold and Marano decided, and Poole agreed, that Barnicle and Van Dorn would be offered "contract" partnerships in the overall venture, but not direct ownership in the DLA corporate entity.  Barnicle and Van Dorn were sold on this arrangement because (i) Barnicle understood that ESD, his full-time employer, had a policy precluding its full-time coaches from receiving additional compensation from parents for personal lessons, and (ii) Van Dorn understood that while Highland Park had no such hard and fast rule against personal lessons, his active involvement in the Bratva debacle put his motivations and credibility at risk in Highland Park.

60.     While the corporate structure of DLA would remain 51% to 49%, there was an agreement among Marano, Poole, Barnicle and Van Dorn that before profits, if any, were distributed by the corporation (*e.g.*, all other obligations of DLA were fully satisfied), the monies would be distributed 40% and 35% to Marano and Poole respectively, and 12.5% to each of Barnicle and Van Dorn.  As part of this agreement, they would eventually announce the combining of DLA with Big "D", but in the interim, Barnicle was required to secure use of ESD's athletic facilities.  It is not clear when Barnicle and Van Dorn learned of Seebold's role in the enterprise, but it was understood that the combined percentages of Poole and Marano included Seebold's percentage.  By email dated January 19, 2009, DLA announced that the "Maverik Lacrosse Academy, Alex Poole and John Marano, and Big D Lacrosse, Chris Van

Dorn and Kevin Barnicle, have decided to join forces to give the kids the best opportunity to improve their skills and get some college exposure."

**Credibility: Facilities and Joint Venturing with a Manufacturer**

61.     The fastest path to success of any new business is credibility with its customer base.   Seebold understood that the goodwill in the North Texas marketplace was with the LoneStar for youth travel teams; StickStar and Team Dallas for high school travel teams; and with the Powell Brothers, Dallas Deuces and Big "D" for skills camps.   A long-time Highland Park lacrosse supporter operated Team Dallas.   All that was necessary to control this program was to establish DLA coaches as the Team Dallas coaches.   Seebold decided Barnicle and Van Dorn could be used in this regard as Poole would likely appear to have a conflict as he was coaching at SMU.   Issues with Big "D" were effectively resolved with the addition of Barnicle and Van Dorn.   DLA's competition was the LoneStar for youth travel teams; the StickStar high school travel team; and with the Powell Brothers and Dallas Deuces camps (both of which were administered by the same local coach who had turned down Seebold and Marano early in the process, which led them to pursuing Poole).

62.     Seebold knew he could secure fields from the Highland Park Lacrosse Program if necessary, but those facilities were not very convenient to families in the Northeastern and Western zones.   Seebold desired use of more geographically desirable and high-end facilities of one of Dallas' private schools to both meet the needs of player families and to create the appearance that DLA was at least endorsed, if not sponsored, by a Dallas private school. Barnicle and Poole secured ESD's and Greenhill's facilities respectively, and Kravit began creating an online presence that suggested that DLA operated in connection with these schools.

63.     Also at this time, DLA continued to work through various relationships with lacrosse equipment manufacturers.  Maverik Lacrosse, LLC ("Maverik Lacrosse") was a couple of years old and attempting to compete against several well-established brands.  Maverik Lacrosse had identified up-and-coming non-traditional lacrosse hotbeds as markets where it was on much better footing than with the larger brands.  Maverik Lacrosse began a relationship with DLA with the intent to get a foothold in Dallas to distribute lacrosse apparel and equipment.  DLA used it as an opportunity to brand itself and begin doing business as "Maverik Dallas Lacrosse Academy" and "Maverik DLA".   Although there was never a joint venture or partnership agreement, Seebold, Marano and Kravit regularly generated marketing materials and electronic announcements stating "Maverik DLA is a joint venture between Maverik Lacrosse, a manufacturer of lacrosse equipment and apparel, and accomplished local coaches" Marano, Poole, Barnicle, and Van Dorn.

**Eliminate the Competition by Any Means Necessary**

64.     Barnicle approached Mr. Munck concerning the DLA enterprise and seeking Plaintiff William A. Munck's personal support.   Barnicle wanted several things from Mr. Munck.  Mr. Munck was a popular coach in the LoneStar program and continued to coach many of the youth and high school lacrosse players attending ESD.   The Munck family, including Plaintiffs William A. Munck and Suzanne T. Munck, also donated financially to the North Texas Chapter to support the LoneStar Lacrosse program, in part to support scholarships for underprivileged players requiring assistance to participate.   Barnicle explained that he was a principal owner of DLA and that his compensation would be based at least upon the number of ESD students that were enrolled in DLA.  Because Mr. Munck was known to many of the ESD families and popular among the players, the RICO Defendants feared that their students and their

families would choose LoneStar over DLA which Barnicle explained would cost several multiples of the LoneStar experience.   Barnicle asked Plaintiffs to terminate Mr. Munck's coaching of and Plaintiffs' financial support for LoneStar and endorse Barnicle and DLA over all other lacrosse programs and camps in the Metroplex.

65.     The RICO Defendants estimated that each ESD player that participated in his for-profit business represented between $4,000 to $5,000 between coaching, gear, camps, etc., and if the ESD players from LoneStar enrolled in this business, they stood to make a lot of money. Barnicle asked Plaintiffs to financially commit their younger son, along with Billy Munck (then a sophomore) to DLA, and not support its competition.   Plaintiffs declined the requests as they related to his younger son and LoneStar, but indicated that Plaintiffs would allow Billy Munck to participate.   The RICO Defendants continued their efforts to establish their for-profit lacrosse business in the Dallas area.   They agreed that Plaintiffs should rethink their commitment to LoneStar, so they plotted to punish Plaintiffs.

**DLA Begins Using Prohibited Methods for Recruiting**

66.     The RICO Defendants found no conflict of interest in actively marketing their for-profit lacrosse business to their youth and high school players.   The RICO Defendants used their respective school programs and clubs to strongly encourage players to pay to attend DLA camps and play on DLA teams.   Upon information and belief, this "encouragement" included statements that any lacrosse players not participating in the DLA program would not be able to participate in their respective high school's lacrosse programs, affecting college recruiting and scholarships.

67.     Because these founders and owners of DLA also had coaching positions at local high schools, they could (and did) "hit up" their families for participation in the enterprise, and

they did affect the playing time of students playing at their respective high schools.  Many parents of local lacrosse players expressed concern that if they did not pay for DLA, their children would be precluded from playing at their schools.  This prohibited practice is referred to as "pay-for-play."

68.    Consistent with this "pay-for-play" concept, the RICO Defendants identified a strategy for selecting the C2C camp teams: make decisions based on the influence of and potential revenue from the parents rather than on the players' abilities.  In 2009, following tryouts where counselors/coaches evaluated players and selected rosters, the RICO Defendants met at the Blackfinn Saloon and discussed specific influential families targeted to support the DLA initiative.  Players who tried out and were not selected by the evaluators replaced other players on the roster because those players' families could affect support for DLA at Highland Park, Plano, St. Mark's, etc.

69.    DLA also did not charge all students full price to participate in DLA camps and travel teams.  DLA allowed some students to pay substantially less than full price in exchange for their loyalty to DLA or based on those players' ability to attract other lacrosse players to DLA.  On information and belief, high school lacrosse players were offered such discounted rates to help promote the DLA brand for select teams and camps and increase participation and attendance from their respective high school programs.  The practice of charging recruiting-age students based on considerations other than financial need violates numerous NCAA rules and regulations.

70.    During a summer 2009 DLA camp, DLA hosted an all-star game for camp attendees.  The all-star rosters included recruiting-age high school players and current and former college student athletes.  A number of these college student athletes were neither camp attendees

nor camp counselors, but rather student athletes that were used to promote the DLA brand and, in some instances, flown in to play in the all-star game.   These players' action photographs were displayed on the DLA website and on Facebook, as well as other promotional materials.   This practice also violated NCAA rules regarding amateurism and promotion of student athletes.

**The DLA Enterprise Countenances Cheating and NCAA Violations**

71.    Despite their touted knowledge of NCAA rules and regulations, DLA and Barnicle participated in violations of NCAA and Southwest Preparatory Conference ("SPC") rules.

72.    Listed below are examples of NCAA bylaws that Barnicle and DLA violated:

10.01.1   Honesty and Sportsmanship.   Individuals employed by (or associated with) a member institution to administer, conduct or coach intercollegiate athletics and all participating student-athletes shall act with honesty and sportsmanship at all times so that intercollegiate athletics as a whole, their institutions and they, as individuals, shall represent the honor and dignity of fair play and the generally recognized high standards associated with wholesome competitive sports.
…

12.3.1   General Rule.   An individual shall be ineligible for participation in an intercollegiate sport if he or she ever has agreed (orally or in writing) to be represented by an agent for the purpose of marketing his or her athletics ability or reputation in that sport.   Further, an agency contract not specifically limited in writing to a sport or particular sports shall be deemed applicable to all sports, and the individual shall be ineligible to participate in any sport.
…

12.3.3   Athletics Scholarship Agent.   Any individual, agency or organization that represents a prospective student-athlete for compensation in placing the prospective student-athlete in a collegiate institution as a recipient of institutional financial aid shall be considered an agent or organization marketing the individual's athletics ability or reputation.

73.    For more than two years, Barnicle and DLA knowingly assisted a supportive parent in using a recent graduate to act as a compensated agent for placing the prospective student-athlete with his former university.   Additionally, whenever either of these assistant

coaches contacted their former universities and offered a report or provided feedback, the assistant coaches functioned as illegal recruiters for the university.

74.     Likewise, during the summers of 2009 and 2010, the RICO Defendants continued their pattern of behavior to maximize the enterprise's revenue.  The RICO Defendants contacted enrolled student-athletes from some of the top lacrosse programs in the country and offered them legitimate positions as camp counselors or select team coaches.  DLA, in violation of NCAA rules, would then use action photos to promote DLA without regard for the eligibility of the player or the affected institution.  When questioned about these NCAA violations, Marano gave sworn testimony that he had no knowledge of the rules and regulations of the SPC or the NCAA and had never inquired as to whether DLA's practices complied with applicable rules and regulations.

75.     In order to compete with other select lacrosse teams in the Metroplex, DLA's teams had to compete successfully against strong competition at national tournaments.  DLA and the RICO Defendants contacted the best players in their respective programs and from other programs around the Metroplex and in some instances offered them positions on "elite" DLA teams without having to pay the full amount.  In addition, some of the better players were asked to replace weaker DLA players already on the roster, and these players were asked to board airplanes, stay at hotels, and play in recruiting tournaments under another player's name.  This practice violates a myriad of NCAA rules for which DLA and the RICO Defendants believe they have no responsibility.

**The RICO Defendants Work in Concert and Begin Targeting Munck in Retaliation**

76.     During the late spring of Munck's freshman year in 2008, Munck was approached about playing for a rising-sophomore select lacrosse team and sought out Barnicle and the ESD

coaching staff for advice.  Munck was told to be wary of for-profit programs that "use lacrosse as a vicious money-maker."  For the fourth time in two and a half years, Munck traveled with a LoneStar lacrosse team that included Barnicle as a coach.  Upon returning to Dallas, Barnicle tried to convince Billy Munck to help out at his Big "D" camps for service hours.

77.     Billy Munck began his sophomore year at ESD in the fall of 2008, just as Barnicle, Marano, and their partners were forming DLA.  By then, Barnicle had changed his tune and was now one of the people who was using "lacrosse as a vicious money maker."  Barnicle approached Mr. Munck as described above.  Billy Munck played on the fall lacrosse team and represented ESD in several tournaments.  However, unbeknownst to Billy Munck or his family, Barnicle had invited virtually all of his ESD teammates (and certainly his LoneStar teammates) to participate in a select program designed for college recruiting.  This was the first time Billy Munck was retaliated against.

78.     On January 15, 2009, Mr. Munck was invited to attend a Wounded Warrior Lacrosse Tournament planning meeting by ESD parents.  At the meeting, Plaintiffs and other ESD families agreed to support an annual college and high school lacrosse showcase intended to foster college recruiting opportunities for the local high school players.  Upon delivering Plaintiffs' donation check to US Lacrosse in the name of "Kevin Barnicle and the ESD Eagles" the event organizer, Tom Fitzsimmons, the President of the North Texas Chapter of US Lacrosse, returned the check to Mr. Munck and informed him that Barnicle openly spoke negatively about Billy Munck and Mr. Munck, including statements like "Billy Munck will never play varsity lacrosse at ESD."  Fitzsimmons stated that this was caused by Plaintiffs' continued support for the LoneStar program, which Barnicle and the RICO Defendants viewed as competition.  Understandably upset that Barnicle would use his position as a head coach to

seek retribution for a parent declining to finance a private, for-profit side business, Mr. Munck arranged for a breakfast meeting with Barnicle on January 30, 2009.  Barnicle predictably denied making the statements and assured Mr. Munck that he cared about Munck and that he was counting on Munck to be "a contributing varsity player this spring season."

79.     Concerned that Barnicle might still be harboring a grudge because Plaintiffs did not help finance Barnicle's side business, Mr. Munck again met with Barnicle on April 28, 2009. At this meeting, also attended by Fitzsimmons, Mr. Munck again directly asked Barnicle if he made prior statements that "Billy Munck will never play varsity lacrosse at ESD."  Although he first backtracked, after Fitzsimmons confronted Barnicle about their prior conversation, Barnicle ultimately admitted having made such statements in public and apologized.

80.     In March 2010, Mr. Munck was contacted by several different sources about different rumors that were being attributed to him.  Upon investigation, Marano's name was always in the rumor mill.  Mr. Munck met with Marano, who went on to tell Mr. Munck about his great lacrosse career and accomplishments.  As it turns out, Mr. Munck and Marano grew up only a couple of miles from one another, and in fact, would have played against one another had Marano actually played lacrosse at East Meadow High School.  In debunking Marano's claims, Mr. Munck spoke with several people that Marano claimed to know only to learn that they had no idea who he was or that they did not remember him playing lacrosse, let alone well.

81.     Mr. Munck discussed DLA's business practices with Marano, including those of Barnicle.  Marano admitted to Mr. Munck that Barnicle did not like Mr. Munck and that Billy Munck was suffering at ESD as a result of Barnicle's animosity.  Marano, the then head coach at Plano West High School Lacrosse Club, knew that Billy Munck had been intentionally relegated to a locker room with freshman and sophomores in an attempt to embarrass Billy Munck into

quitting or coerce Plaintiffs into finally supporting the DLA enterprise.  In view of Mr. Munck's knowledge of Marano's continuing fraud on the North Texas lacrosse community, Marano offered and worked through his counsel to attempt to resolve DLA's and Barnicle's issues with the Plaintiffs by offering to and actually interceding and "fixing" Barnicle's treatment of Billy Munck.  After Marano's intervention, Barnicle allowed Billy Munck to dress for 11 varsity games and play in 9, but did not reassign Billy Munck to a varsity locker or award him a varsity letter at the end of his junior year.

**The RICO Defendants Continue to Use Illegal Means to Increase Profits**

82.    While Billy Munck transferred out of ESD and North Texas, later graduating from Millbrook Academy and going on to play lacrosse for Southwestern University, the RICO Defendants continued their pattern of criminal acts to build their DLA brand and maximize revenues.  Plaintiffs' younger son, Garrett Munck, is a sophomore in high school and plays competitive lacrosse at Jesuit Preparatory School of Dallas.  Garrett Munck has refused to participate in DLA lacrosse offerings, given his and Plaintiffs' understanding of the false and misleading practices that DLA employs.  To date, Garrett Munck and Plaintiffs fear retaliation from the RICO Defendants as a result of both Plaintiffs' refusal to financially support the DLA enterprise and Plaintiffs' attempts to expose the corruption and bad deeds the RICO Defendants' employ to advance their enterprise.

83.    The RICO Defendants have continued the illegal and criminal acts employed during Billy Munck's tenure at ESD.  To date, the RICO Defendants have continued to use U.S. Mail, commercial mail carriers, and electronic mail to defraud the public and its customers by publishing false and misleading statements regarding the qualifications of the RICO Defendants, including Marano's background.  The RICO Defendants also used such methods to target and

retaliate against lacrosse players and their families that either did not or were perceived to not support DLA.  The RICO Defendants further used such methods to defraud third parties, including airlines and tournament coordinators, by publishing false and misleading information regarding lacrosse players/travelers' identities and/or ages.

84.     The RICO Defendants' use of threats and intimidation has also continued.  One North Texas lacrosse player was told by Marano that he would be pulled from consideration from playing on Team Dallas and would not receive accolades for lacrosse accomplishments unless the student withdrew from participating in StickStar, a DLA competitor's program, and instead played for DLA.  After the player refused to cede to the RICO Defendants' threats, the RICO Defendants followed through on their threats, with Van Dorn calling the student's father to inform him that the student would not play on Team Dallas within minutes of informing Marano of the decision to honor the student's commitment to StickStar.  The RICO Defendants also continued their retaliatory behavior by blocking the student from obtaining All American honors.  Indeed, the RICO Defendants are proud of their ability to threaten and intimidate North Texas lacrosse players, going so far as to brag about how DLA coaches "control the rooms" by having enough votes to control which students receive honors in lacrosse, including for accolades such as Team Dallas, All District, All State, and All American.

85.     Finally, Marano and the other RICO Defendants have engaged in a pattern of illegal behavior to cover up and hide the illegal activities described herein.  Plaintiff William A. Munck filed a petition for pre-suit testimony, pursuant to Rule 202 of the Texas Rules of Civil Procedure, to investigate his potential claims.   During a deposition as the corporate representative of DLA, Marano made multiple false representations in a deliberate effort to

obstruct justice and hide his actions, including by providing knowingly false testimony regarding his lacrosse experience and the RICO Defendants' actions towards Plaintiffs.

## V.
## CAUSES OF ACTION

### Count I:  Violations of RICO, 18 U.S.C. § 1962(c)

86.     Plaintiffs reallege and incorporate herein by reference the allegations set forth above.

87.     Plaintiffs are persons within the meaning of 18 U.S.C. § 1961(3).

88.     Each RICO Defendant is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

**The RICO Enterprise**

89.     The RICO Defendants and their co-conspirators are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in this Complaint.  The RICO Defendants have used fraud, threats, and other illegal activities to try to grow their pro-profit lacrosse business and to harm anyone they perceived as a threat to that venture.

90.     The RICO Defendants and their co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  In the alternative, DLA is an enterprise.  Each of the RICO Defendants participated in the operation or management of the enterprise.

91.     At all relevant times, the enterprise was engaged in and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

**Pattern of Racketeering Activity:  Mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343**

92.     As described above, the RICO Defendants engaged in a scheme to defraud plaintiffs and the lacrosse community in North Texas and elsewhere.  The ultimate objective of the RICO Defendants' scheme was to grow their for-profit lacrosse business using any means necessary.

93.     In furtherance of their scheme, the RICO Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, or sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including, but not limited to, the following:

- Emails and website postings incorporating false and misleading statements regarding the lacrosse experience of one or more of the RICO Defendants, including Marano;

- Wirings and/or mailings between or among the RICO Defendants concerning treatment of lacrosse players that did not or were perceived not to support DLA; and

- Wirings and/or mailings between or among the RICO Defendants and third-party organizations, including but not limited to airlines and tournament coordinators, incorporating false and misleading information regarding the identities of players/travelers.

94.     The RICO Defendants participated in the scheme knowingly, willfully, and with the specific intent to deceive and defraud the Plaintiffs, as well as the lacrosse community.  The RICO defendants knowingly and intentionally made misrepresentations about themselves, as

well as their perceived competitors in an effort to mislead the public, including especially the parents of student lacrosse players.

95.     The RICO Defendants' false and misleading statements have been relied on by Plaintiffs, lacrosse players, and parents of lacrosse players.  Further, the RICO Defendants' false and misleading statements have caused Plaintiffs damages.

### Pattern of Racketeering Activity:  Interference with commerce by threats or violence in violation of 18 U.S.C. § 1951

96.     At all times material to this complaint, lacrosse was played nationwide and affected commerce in the United States.

97.     As described herein, the RICO Defendants have engineered a wide-ranging campaign of attacks based on false and misleading statements.  The RICO Defendants have disrupted business operations of multiple companies and have demanded participation in their enterprise, all with the intent and effect of causing harm and economic loss to Plaintiffs, as well as others.

98.     As described herein, the RICO Defendants extorted Plaintiffs so that they would not participate in a competing but non-profit lacrosse program.

99.     The RICO Defendants' actions were intended to induce fear in Plaintiffs that the RICO Defendants would cause harm to Plaintiffs and their family.  These actions have created a reasonable fear of harm on the part of Plaintiffs, including fear of economic loss.  Accordingly, the RICO Defendants have unlawfully obstructed, delayed, and affected — and attempted to obstruct, delay and affect — commerce by extortion as those terms are defined in 18 U.S.C. § 1951, in that the RICO Defendants attempted to induce Plaintiffs to consent to relinquish property through the wrongful use of actual or threatened force, violence, or fear — including fear of economic harm.

**Pattern of Racketeering Activity:   Obstruction of justice in violation of 18 U.S.C. § 1503**

100.    Prior to filing a state court action against some of the RICO Defendants, Mr. Munck took the deposition of C2C and Marano pursuant to Texas Rule of Civil Procedure 202.

101.    In an effort to thwart Plaintiffs' attempts to uncover the truth, Marano made numerous false representations under oath regarding his lacrosse experience as well the RICO Defendants' actions towards Plaintiffs and others.  Marano did so with the full knowledge that these statements were false.  Marano made such knowingly false statements both in his individual capacity and as a corporate representative of DLA.  By making these deliberate and false representations in a judicial proceeding, with full awareness of their consequences and with specific intent to influence, obstruct, and impede the due administration of justice, the RICO Defendants have committed obstruction of justice in violation of 18 U.S.C. § 1503.

**Relief**

102.    Plaintiffs were injured by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(c).

103.    These injuries to Plaintiffs were a direct, proximate, and reasonably foreseeable result of the violation of 18 U.S.C. § 1962.  Plaintiffs are victims of the RICO Defendants' unlawful enterprise and have been and will continue to be injured in an amount to be determined at trial.

104.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages, plus attorneys' fees from the RICO Defendants.

105.    Plaintiffs are further entitled to, and should be awarded a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone acting in concert with them from any attempts to injure Plaintiffs or their family.

## **Count II:  Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)**

106.    Plaintiffs reallege and incorporate herein by reference the allegations set forth above.

107.    The RICO Defendants have unlawfully, knowingly and willfully combined, conspired, and agreed together and with others to violate 18 U.S.C. § 1962(c), as described above, in violation of 18 U.S.C. § 1962(d).

108.    The RICO Defendants knew that they were engaging in conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the parties' participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.  This conduct constitutes conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. §1962(d).

109.    The RICO Defendants agreed to conduct or participate, either directly or indirectly, in the conduct, management, or operation of the enterprise's affairs in violation of racketeering activity in violation of 18 U.S.C.§ 1962(c).

110.    As part of the conspiracy, the RICO Defendants and their co-conspirators committed a pattern of racketeering activity in the conduct of the affairs of the enterprise, including the acts of racketeering set forth above.

111.    As a direct and proximate result of the RICO Defendants' conspiracy, the acts of racketeering activity of the enterprise, the overt acts taken in furtherance of that conspiracy, and violation of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property.

112.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

113.     Plaintiffs are further entitled to, and should be awarded a preliminary and permanent injunction that enjoins Defendants and anyone acting in concert with them from any attempts to injure Plaintiffs or their family.

## VI.
## JURY DEMAND

114.     Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs William A. Munck, Suzanne T. Munck, and William P.J. Munck pray for relief against Defendants Dallas Lacrosse Academy, LLC d/b/a Coast2Coast Lacrosse, d/b/a C2C Lacrosse, and d/b/a Maverik Lacrosse Academy, John A. Marano, Kevin Barnicle, Alexander Poole, Christopher Van Dorn, Robert Seebold, and Steven Kravit as follows:

(a)     A judgment for Plaintiffs and against all Defendants for Plaintiffs' actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. § 1962(c) plus interest;

(b)     A judgment and order requiring Defendants to pay to Plaintiffs treble damages, under authority of 18 U.S.C. § 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. § 1964(c) plus interest;

(c)     A preliminary and permanent injunction enjoining Defendants and anyone acting in concert with them from any attempts to injure Plaintiffs or their family;

(d)     A judgment and order requiring Defendants to pay Plaintiffs their reasonable and necessary attorneys' fees;

(e)     A judgment and order requiring Defendants to pay Plaintiffs the costs of this action; and

(f)      Such other and further relief as the Court deems just and equitable.

Dated:  March 25, 2014                     By: */s/ Jamil N. Alibhai*
                                           Jamil N. Alibhai
                                           Texas State Bar No. 00793248
                                           jalibhai@munckwilson.com
                                           Jennifer Beth Ingram
                                           Texas State Bar No. 24038972
                                           jingram@munckwilson.com
                                           Jessica L. Spaniol
                                           Texas State Bar No. 24072360
                                           jspaniol@munckwilson.com
                                           **MUNCK WILSON MANDALA, LLP**
                                           12770 Coit Road, Suite 600
                                           Dallas, Texas 75251
                                           Telephone: 972.628.3600
                                           Telecopier: 972.628.3616

                                           **COUNSEL FOR PLAINTIFFS**
                                           **WILLIAM A. MUNCK, SUZANNE T.**
                                           **MUNCK, AND WILLIAM P.J. MUNCK**

613061